Mr. Dorney, you may begin when you're ready. May it please the Court, Your Honor, I'm Brett Dorney. I represent the Appellant Arch Lighting Group, also known as Architectural Lighting Systems, or ALS, in this case. Is it arch or arc? Arch. Arch. They call it arch, but it's short for architectural, Your Honor. That's why I wonder. This appeal is straightforward. There's three issues for the Court to address here. First one is whether the district court erred in failing to give an instruction under Section 112, Paragraph 6, relating to a means plus function element in the claims, and whether as a result of that, a new trial should be ordered. Second issue is whether the court erred in denying ALS's motion for judgment as a matter of law based upon the lack of substantial evidence supporting the jury's verdict. And the final issue is the cross appeal by Jen Light regarding the additional damages that the court originally awarded and then removed based upon his prior instructions to the jury. There's a little bit of background, though. I'm sure you have read the papers. The problem that you have, it seems to me, on the substantial evidence question is you didn't challenge the claim construction that the district court adopted here. That's correct. That's correct, Your Honor. The second question is, under that claim construction, is it not the case that the two fixtures can have identical light patterns? No, Your Honor. For the following reason, the claim construction, as the court set forth, said that the reading light is to direct more light in a downward direction to a reading area than in an outward or upward direction. The second fixture, known as the ambient fixture, second fixture is to direct more light in a downward and outward direction to the wall than in an upward direction. And these are two different fixtures, two different descriptions of the way it directs more light. I don't see why they are different. I have to say, I mean, I'm reading from your proposed jury instructions, which the judge accepted verbatim, I think. Is that correct? I think so. On that regard, I think they were agreed to. And suppose what we have is two identical light fixtures that send most of the light, very little light upwards, most of the light downwards and some to the side. First fixture would certainly direct more light in a downward direction than in an upward or outward direction. Fifty-six percent, I think, is the number that the evidence showed down. Forty-four to the side. Yes, Your Honor. Okay, check. That one is satisfied. The second one, more light downward and outward than in an upward direction. Also, check. You've left out part of that term there, which is downward to the reading area and outward to the wall. But the reading area is only that reading area? No, it's not downward only the reading area. It's more light downward to the reading area. Well, it's the whole bit. Right. There's light in the ALS fixtures. There's light that goes everywhere from both fixtures. Before we get away from this, I'm really concerned that there's just a logical flaw in your argument here. I want to see if I'm wrong in thinking that. I want to know exactly why. Now, would you agree that a 56% down, 44% to the wall claim limitation one is satisfied? Except for, Your Honor, you can't have 44% to the wall because you have 56% down. You've got some going to the wall and you've got some going out into the rest of the room. Okay. You're going to have very little light. 56% down. All right. Some going elsewhere. That's the point. That satisfies number. You're going to have very little light going to that wall from both fixtures. Okay, stay with me here. Right. The light in this case really does satisfy. The first fixture does satisfy the first limitation, right? Yes, I think it's agreed. Now, why doesn't the second, even if it's identical, also then satisfy the second fixture limitation because all it says is oriented downwardly and outwardly to a vertical wall means arranged to direct or aim more light in a downward and outward direction than in an upward direction. That seems to me by its plain terms to say more is going down and out than is going up, period. What am I missing? You missed out the term going to the wall. It's more light going to the wall in a downward and outward direction to the wall. And so the point here is you've got two target areas. You've got one target area that says I want more light to the reading area and one target area that says I want more light to the wall. And that's what the court said. More light to the wall than up. Than up. Right? That's correct. The comparison is always to up. There's no light going up. I understand that. That's the reason why I didn't understand why somebody didn't challenge the claim construction because it's goofy. I understand. If you look at the patent, the patent is obviously talking about a pencil light like you have in an airplane. It comes down on your book or in a bed, and that's what the first light was supposed to be. And the second light is a broader light that broadcasts down, covers the whole bed, and gets the walls. Actually, no, the second light is not one that's broadcast to the whole bed. The second light is one that's directed at the wall. No, it's directed downwardly, right? Downwardly and outwardly. It can't be. When it goes, is it down and out is the concept that it's an angled motion? No, at an angle. I mean, if you look at figure one of the patent. I understand. It shows down and out. I understand how I would have argued claim construction, but we're locked in with the claim construction that the presiding judge has just been reading us to from the jury charge. Yes, Your Honor. And as I read that instruction, it requires that there be more light to the reading area from one fixture and more light to the wall from the other fixture, which says there can't be two identical fixtures that then have more light going in different directions. Two sources of light that broadcast the same pattern. That broadcast the same pattern, because then the claim would cover every fixture that exists in the world. That's a problem, but it's a problem that we can't really get at in this case if we read the claims construction to be that broad. I wonder whether the district court here gave a complete claim construction. I went back and I read the charge conference. He gave instruction at the beginning of the trial, which is the only place he gave the language we've just been talking about, right? And then he gave another claim charge right before the jury recessed, right? Correct. And my understanding is that he gave them the patent. He told them to look at the patent. And as I understand it, he didn't address the question of whether the two fixtures could be the same or had to be different. No, he did not address that specifically, Your Honor. And you didn't object to the charge? I did not object to the charge with respect to the claim construction, because the claim construction, as I understood it, said that more light was required to go down to the reading area from one fixture and downward and outward to the wall from the other fixture. Well, but the question, assuming that you lose and that the interpretation that he gave doesn't help you, that remains the question of whether when he told the jury to look at the claims, whether there is a question as to whether the jury could find that identical fixtures looking at the claims infringed. In other words, did the court give a complete claim construction, or did he leave this issue of identity to the jury under a reading of the claim language itself? Well, I think that's where we come in here, that the jury was left with, clearly could only have been left with the thought that they could find that two identical fixtures infringed under the doctrine of equivalence. I now don't understand. You say that they were left with that impression that they could find. Why? Because they had been misinstructed? No, I'm not saying that they were misinstructed. You have no problem with the instruction, right? I didn't have a problem with the instruction. Any omission in any of the instructions. You're not contesting. Not with respect to the fixtures. Right. I understand the 1126. But with respect to the fixtures, you're fine with the instructions that were given, when they were given, what was given. That's correct. I do not object to those. That's correct. Didn't you just say that the instructions given would have left the jury, if the jury wanted to, to find that two fixtures that broadcast the same pattern of light were infringed? Well, the jury did find that. That's what I mean. They were free to find that under these instructions. Yes, they were not free to find that under those instructions. Why not? Because, as I said, the instructions... I know how you feel about what the claims mean or through the claim instruction, but why not? Because the judge had instructed them that they had to find, as I said, more light going to the reading area and more light going... Well, Sam has been manualing up. I mean, if you... If we reject that... If we reject that, the question is whether, by telling the jury to look at the claim language, he left open to them to go one way or the other on the identity of the fixtures. In other words, it wasn't an issue covered by the charge. Correct? Yes, if that's... If you reject what I have said about the interpretation of the claim as he gave it to them, he did say to look to the claims themselves. Okay, so the question is then what are we supposed to do in these circumstances if the charge doesn't address the identity question? How are we supposed to review the jury verdict under those circumstances? Under... It comes back to the issue of can the claim... Does the claim... Can the patent itself, as the claims are drafted and as presented to the jury, cover fixtures that are identical? And as stated in our brief, in our opinion, the claims cannot cover fixtures that are identical. We didn't understand the court's charge to be that. I didn't understand the jury to be so instructed that they could be identical. Wouldn't that lead one to say to the judge, look, your honor, you can't let the jury possibly reach a conclusion that two fixtures that broadcast identical life patterns could infringe this claim. You need to instruct the jury as follows. But that would require an objection to the jury charge, right? That's correct, your honor. Because, I mean, I think all the time charges are given to the jury. It turns out later, you say, boy, that was the wrong charge. And under that charge, the jury could have found me guilty, but I didn't object. And if you didn't object, you waived your right to complain, right? That's correct, your honor. If you don't object... It's a similar issue. We haven't talked about the 112-6 issue. But the argument is that you waived the right to complain about no charge on 112-6 because the judge said, present this issue at summary judgment time. You raised the 112-6 issue at the Markman hearing. The judge waived you off and said, I deal with those things at SJ time. SJ time came along and you filed a summary judgment of non-infringement. But you didn't mention 112-6. Didn't file a motion for invalidity on 112-6. No, I didn't file a motion for invalidity on 112-6. And we're not claiming invalidity under 112-6. We did... I didn't see that in the record. Is that in our record? What? The invalidity? Yeah. No, it's a question of the jury finding infringement. The jury was not instructed that they needed to compare the structures in the specification to the structures in the accused product. And that was a jury instruction that was proposed to the judge, which he refused to give. And that was objected to. Where is the proposed instruction on 112-6? The proposed instruction was in the post-jury instructions. I believe it was... Was that? I have a copy. It was in your proposed instructions, a collection of the instructions. Right, the proposed collection of the instructions. How could you not include it in the joint appendix if it's not there? Is it in the joint appendix? I thought it was in the joint appendix. I actually don't think so. I think that's the section that page 1884 was taken from. And I think we asked you for a copy of that. And I think that was submitted. Okay. So I think it's that page. Right, so it is... There was an instruction requested. The judge refused to give that instruction as part of the charge conference after the jury had been charged. At sidebar, I objected again to that. Did he tell you why he refused to give it? No, Your Honor. He said he was not giving it. And I objected again after the jury was charged. And the judge said that he was not going to give that and that he believed I had preserved my rights on objecting to that. And that is an issue that the jury could not make a decision on Section 112.6 because they were not instructed as to the law as to that means for ceiling mounting the body. And standard there is it's prejudicial in this case because there was lots of testimony from Jed Light's expert about this T-bar grid ceiling system. In fact, he had a structure in the courtroom where he inserted these fixtures into a T-bar grid system, which is not mentioned anywhere. Your expert testified that the only disputed issue was with respect to the second light fixture. He was only addressing the second, the fixtures issue. Now, the question was, when you prepared your opinion that you discussed earlier, your opinion assumes and concedes the existence of all the elements of Claim 1 and Claim 3 except the second light fixture of those claims. Is that correct, sir? Yes. Yes. That's all the elements of 1 and all the elements of 3. The only thing left is Fixture 2. Where is means plus function in there? Right. Conceded, right? No, Your Honor. His opinion was assumed those other elements, but plaintiff still has to prove those elements. Assumed or concedes? He says concedes. Assumes and concedes. Concedes means gives up. My expert did not address any issues relating to the 112.6 issue. He simply was addressing the second. Are you saying that his answer was wrong? He shouldn't have given that answer. In terms of conceding, yes, because his opinion was limited to consideration of the fixtures issues, not the 112.6 issue. It still leaves for the plaintiffs to prove infringement. Well, there was a lot of evidence that was brought in that the mere reference to a conventional troffer was sufficient reference to structure. It's a hole, and everybody knows you tuck the stuff up in the hole. You don't need to disclose what one of ordinary skill in the art would know, like you'd need a hanger or you'd need a screw or a bolt or something to hold the thing up. The missing thing, the element was the judge didn't charge the jury that I find, the judge would say, I find that the reference to a conventional troffer is structure. And so the ordinary skill in the art would attach this to that structure, and then you get that plus all structural equivalent. But not only that, Your Honor, but the judge didn't tell them they had to do any comparison of structure. The judge didn't tell them anything regarding the means plus function. Maybe perhaps the judge thought the issue was on because there had been a concession by your side that the accused devices met the means for sealing mounting limitation. The judge never said that. The judge said if you want to talk to me about 112.6, come to the summary judgment meeting and bring me a motion saying that there's no infringement as a matter of law under 112.6 in an S.J. And he didn't get that. Right. And that was left for trial. There was no decision at the summary judgment and was left for trial, and therefore that he needed, he should have instructed the jury under 112.6 so they could make a proper determination of infringement. But what is it that they're supposed to be doing? Are you suggesting that the jury should have been instructed in such a way that they could look at the specification and say there is no structure described? No, Your Honor. That they need to look at the specification and compare the structure in the specification to the structure in the accused product. And they were never... And what determination could they have made on that subject which would have been favorable to you? That they have different structures. The testimony was that this whole question of the T-bar grid system, which is not in the patent, versus my client testified that they used a hanger system. Are you suggesting that the jury should have concluded that some other fastening means was necessary because of the specification? Yes, that there needed to be some fastening means and they needed to determine what that structure was. No, no, but we're not communicating here. What I'm saying is, as a matter of infringement, what do you think that the jury should have concluded was the structure in the specification that they had to look for in the accused device? The most they could look for in the specification was a troffer. Okay, so let's assume that we adopt the most favorable construction to you, is that the specification only described a troffer. And then the question is, does substantial evidence support the verdict under that interpretation? Well, there's two questions. One is, does substantial evidence support the verdict? The second is, was the jury instructed so that they could make a proper determination in the first place? There is the instruction issue, which is they were not... than what we're assuming, which is that the only structure in the specification was a troffer. Well, because then they need to compare that to the hanger system on my client's product. He testified that it uses chains or wires that hang it from the ceiling. There was nothing in the specification, even under troffer, that suggested hangers or wires. And so there's a question of, can the jury determine that this is an identical or equivalent structure? If they've never been told, they need to be making that determination of whether this is an equivalent or identical structure. Well, there was never a claimed construction. The district court judge never said, I have read the spec and I agree that a conventional troffer is the only structure in the spec that makes up to the means for mounting. Judge never did that. And if the judge had done that, he then, as a matter of law, could have said, well, I can decide that one of ordinary skill in the art would understand the conventional troffer to have two or three other little pieces. That's part of the legal analysis. And then that would be the structure, and then the patentee would be entitled to that structure and any structural equivalent. Right? Correct, Your Honor. But that never happened, and there was no objection to the lack of a claim construction. No, there was not an objection to the lack of a claim construction. Which was the fault. The judge is saying, well, nobody's telling me that I need to construe this claim. This means claim, I don't have to hunt around in the spec and look for structure. Right, Your Honor. But the jury is supposed to then make a comparison between the structure and the specification and the structure of the accused product. And they were never instructed to do so. Was the jury in when the language of the presiding judge read a minute ago where there was a concession by your expert that the limitations of the claim volunteer were met except for the second lighting fixture? Did the jury hear that testimony? Yes, they did hear that testimony. You sit in the jury box and you go down and you say, what about that means limitation? They say, we don't need to worry about that. That was conceded. Right. But then you have them making a decision without being instructed as to what the decision is they need to make. Okay. I think we have your... I'm sorry. Did you have a further question? No. I think we have your case. Why don't we hear from the... Thank you. Appellees. Mr. Higgins. Good morning, your honors. With me on brief are Robert Turkoff, James Milliman. We believe that the original judgment in this case should... The evidence in this case was that the light patterns of the two fixtures were virtually identical? In the test mode, your honor. Only in the test mode. The problem with ALS's presentation to this court and the problem even today is that they keep using shorthand to describe what the claim construction of the court was. We're not talking about claim construction. I'm talking for the moment about evidence. Was the evidence that the two light fixtures had virtually identical light patterns? That was the evidence in the test mode. Was there evidence in the test mode? Yes, there is. If you'll look at page A241. That's the plaintiff's testimony. This has to do with the language of the claim construction oriented to direct. And that brings more to play than just the mere distribution pattern that is emitted by the light fixture. That's a different question. That's not my question. My question is, is there evidence that the accused product, the two light fixtures in the accused product, had basically the same light pattern? Yes, your honor. That evidence is in the record. Now the question is, how can you possibly read this pattern? Forget about the claim construction that the district court gave. How can you possibly read this pattern to say that two fixtures with identical light patterns satisfy the claims? There is no requirement in the claims construction by the court. No, you're not answering my question. I apologize, your honor. My question is, forget about the claim construction by the court. Just look to the patent itself. How can it be that two identical fixtures satisfy the claim limitations of the patent? There is no requirement that they be mutually exclusive. And each of them, when combined with the oriented to direct feature of the claims, can accomplish exactly what the jury observed. So no, no, no, no. Address the patent itself. Is your contention that two identical fixtures can satisfy the claim limitations of the patent? Yes, your honor. It certainly is. Why is that? Because the entire context of the patent is to replace the prior art fixtures that used to light a hospital patient room with a ceiling-mounted luminaire, as it's called, containing multiple light fixtures. And the language and teaching of the patent, compared to the prior art, I'm kind of addressing your question, your honor, about this claim construction is goofy because it only has no up light in a ceiling-mounted system. The reason that it's not goofy is because it replaced light patterns that did light up. And that's why it's important in the claim construction. Right. But, I mean, isn't your best response to Judge Dyke to say that the first light fixture doesn't say only downwardly to a selective reading area? I wish I'd said it that well, your honor. Yes. So your point is it doesn't say only, and the other one doesn't say only downwardly and outwardly. And so the first light fixture, if it can broadcast down, it goes to a selected area, but it does something else, too. That's correct. And the second one does exactly the same thing. The second one does exactly the same thing, but because it is oriented different in the total luminaire with respect to the head wall. If the court will look over to this direction, you will see some recessed lights that are down, but they're directing light to the wall as well. I'm still not understanding what you're saying. The figure in this patent shows two different light patterns. How can it be that this patent would have been granted for two identical light fixtures throwing exactly the same light pattern in the hospital room? How could that be? The light fixtures, your honor, accomplish two different functions that are necessary for the light needs of a hospital patient room. And by orienting them differently, as the patent teaches... But that's the key question. What do you mean by orienting? If you mean by orienting that they're going to shine light in different directions, then I think your answer to Judge Dyke is that the patent doesn't read on a system that has two identical fixtures. What do you mean by oriented? Because that language puzzled me. You mean... Well, let me ask it this way. The first limitation... The second, actually. It says, oriented to direct light downward. The next one says, oriented to direct light downwardly and outwardly. Now, if the first one is oriented to direct downwardly and outwardly, does that satisfy the first fixture limitation? Do you understand my question? I think I do, your honor. And with respect, I think the court has just done the same shorthand that ALS did at trial. Wait a minute. Let's go back to oriented. And stay with me on this. It's certainly important to me. But I'm trying to get a handle on whether there's language in these two limitations that tells us that these lights have to be pointed in different directions. And you started to say, well, the difference between the two is in the orientation. Which got me to thinking, well, is he saying that one is pointed down and the other is pointed in a different orientation or direction? But you now seem to be saying, well, no, it doesn't have to be pointed in a different direction. They can both be, in the first case, oriented downward and also outward. And the second can be oriented downward and outward. And that's good enough to infringe. Is that what you're saying? Not quite, your honor. How not so? These light patterns that are being emanated are coming from a fluorescent fixture, which there's testimony in the record that it is emitted in a blob, quote unquote. The expert said that is a 360 degree range of horizontal angles. But I think blob was more understandable to the jury and to the judge. In this case, oriented means, according to the judge, set or arranged. And you set or arrange the fixture within the luminaire such that it accomplishes the different lighting tasks even with the same distribution. If it's the same distribution, the only thing that would seem to me to produce a different lighting task is brightness. Because if you have two lights of the same brightness and they both have the same distribution, then they're performing exactly the same lighting task. Are they not? They are, but I again come back to the difference between test mode and field mode, which is where the pattern lives. Where is the evidence of field mode in the record? It is in the discussion that I had with Mr. Lemons and Mr. Lewin. By the way, we have Lemons and Lewin talking about lumens from light. You got a record site page? Hold on, your honor. I'll get that right in a second here. In Mr. Lemons' report at page A298, it is discussed. It's discussed as well by Mr. Crane in his direction. Page 298? A298. 298. A298's testimony, right? Yes, sir. Not exactly test mode, but it talks about oriented to direct. What line? A298, read us the date, what type of fixture, wall-mounted fluorescent. Yes, this is discussing, this is Mr. Lemons' report. This is discussing why up-light is currently inventive compared to no up-light. I thought you were trying to tell me that in addition to the so-called test mode, which shows identical light distribution of the two fixtures in the accused device, there was some field mode testing that showed something different. Yeah. I don't see that on page 298. Let me point the court to page 729. Give that a try. More testimony. And this is where I am discussing with ALS's expert the activity with respect to the test mode versus the photometric port that you see at line 12, Your Honor. In all of this, I am discussing the difference between what the test mode does compared with the luminaire in actual field operation. Did you have one in the room that you turned on and off? Yes, sir. We had every accused fixture in the room. We turned them on and off. The jury saw all of that. And when they turn the accused light device on, when you're trying to do the first function, which is the first light fixture that's down related to the reading area in the accused device, was that a real bright light or was that a fairly soft light? I mean, I got the impression somewhere there was an intensity variation here. Well, that was part of the proof that the so-called highest intensity, which is less than 1% of the total output of the fixture. But the light intensity from both fixtures within the ALS luminaire is approximately the same. But the jury saw If you were lying on a bed under the accused device and your desire was to read this piece of paper right here but nothing else, like you were in an airplane, you know, you got that little pencil beam down, does the accused device broadcast light just to this area? Yes, sir. It was not just to that area, but it certainly broadcasts. It sends light to that particular area. So you're saying the intensity is the same, basically the same? The intensity, the total lumen output from each fixture is approximately the same. And the distribution is approximately the same. So if I were deciding, as Judge Clevenger said, to try to read something, how would I know which switch to flick? The reading light or the non-reading light, the ambient light? They're the same is what you're saying. But they're not the same. How are they different? Because they're oriented differently within What do you mean by oriented? Particularly the distance between the wall, which is, to use Mr. Dorney's word, the target of the second light fixture. That's important, the difference. So you're saying that the orientation is the distance from the wall? That's how it's set or arranged. That is correct, Your Honor. And the jury saw that these two so-called similar light patterns actually emitted different light patterns in the field, in setting. I don't see where that testimony is. It's in every testimony. We demonstrated the light fixture of each accused fixture. Is it in our joint appendix? Yes, sir. Somebody was saying, at one stage, they said, darken the room. I remember that. Yes, sir. And then is there extensive testimony about what one was saying about the light patterns? Yes, Your Honor. Every feature and limitation of the claims was discussed, beginning at page A325. And that's describing the cart that, in turn, is describing the way that the light fixtures are used. I don't understand what you're saying. You say the light patterns are substantially the same, the intensity is substantially the same, but you seem to be saying there's some sort of difference. What's the difference? The difference, Your Honor, is in the orientation of the light fixtures with respect to the headwall. So, in other words, you've got light number two is closer to the headwall, therefore pours more light under the headwall, therefore reflects more light out into the ambient area. Is that the point? That is the point, Your Honor. Okay. Now, I would like to – Where do we find that testimony? Beginning at A325, you will see that each element of the claims is discussed by our expert, Mr. Lemons. Now, I have just a brief moment that I would like to discuss our cross appeal. On your cross appeal, what possible authority is there for the notion that when you're responding to a document request or an interrogatory answer that you have to update that with respect to future events? Rule 26E, Your Honor. No, Rule 26E is not talking about that. Rule 26E is talking about if you make a mistake and you fail to include documents that existed at the time of the document request or information that existed at the time of the interrogatory, you have to supplement it to correct it. I don't see, and maybe you can point me to language, I don't see where there is an obligation to bring it into conformance with future events happening after the document request. Well, first of all, there was a request for an accounting. Paragraph 4 of the original judgment actually responded to that request for accounting. No, no, no. I'm talking to you about what the rules require. I have never understood this rule that you're relying on as to mean that you can put in a document request and that it covers future created documents. And I looked, I asked my clerks to research this. I can't find a single case that suggests that. Are you aware of one? No, Your Honor. I agree with you. There is no case law. But the rule itself says, quote, a party who has responded to a request for discovery is under a duty to seasonably amend a prior response to an interrogatory or request for production if the party learns that the response is in some material incomplete. If there are additional sales, which we express the ask for. Incomplete means incomplete as of the date of the response. If you leave something out that existed at that time, if there were sales that existed up to that time that you left out, you have to supplement. You can't put in a document request or an interrogatory which requires a party to respond with respect to future events. If you want to cover future events, you have to put in a new request. We did, Your Honor. Even during trial, we asked for additional information. It was a formal request. There was an email. That is correct. It was not a formal request. You didn't have any kind of a court directive or order with respect to this, correct? No, there was no order to provide additional materials. But they came to trial, and they knew they had 13% of their total production, infringing production, and they withheld it. They concealed that from us. Concealed it? Yes, sir. When you ask for sales and you don't get complete sales. That's your reading of the federal rules. I'm suggesting to you that your reading of the federal rules is not correct. And you haven't been able to show me any authority to suggest that your reading is correct. This would come as a rather surprise to a large part of the bar that you can put in a document request that covers future created documents. Well, it's not created documents, Your Honor. It's an ongoing tort, if you will. And I think that the rules, at least in cases that I have done before, it's kind of standard that you continuously update your sales to time of trial. They did supplement once. That's what brought the data to September 30th. We asked for data after September 30th, and they said mute. But I assume that you must have assumed, at least in the absence of a representation to the contrary, that there were ongoing sales. Well, when you ask the question and you get no response, I think that we're entitled to rely on the non-response that we're dealing with people who are telling the true facts. If you got the response that there weren't any sales, you would be entitled to rely on it. But if you send an email saying, send us any information about additional sales, and you don't get a response, my recollection was, and maybe I'm wrong about the way the record reads on this, but my recollection was there wasn't a denial that there had been additional sales. Is that right? You are correct, Your Honor. There was no denial. So you had every reason to suppose that that which had happened before whatever it was, September 30th, was continuing. Yeah. That's why you asked. That much is correct. Right. And what I'd like to do, if I— I think that you could have gone to the court and said, you know, in the interest of trying to have the judgment reflect the situation at the time that this case goes to the jury, we'd like an order getting additional information. We thought we were getting additional information. We didn't. And then what I'd like to do, if I may, is to relate the judge's actual instruction to the facts. Quote, figure out a reasonable royalty and then apply that royalty to the products that you think infringed over the time that you think they were infringing up to today. That's the day of trial. And in fairness, you will recall that Mr. Tate—he was our damages expert—said he stopped his analysis back in September of last year. That's because that's all the information that we had for failing. Yeah, but so what the district court said in rejecting your motion to amend the judgment was that the jury could make an estimate under that instruction based on the past data, correct? If they had— Is that what the judge said? That is what they said. But if the court—if the jury were given the opportunity to make an estimate, they would be off by at least a factor of two. During the period of time— Well, so you could have said something about it. You could have asked for a different instruction. You could have asked for supplemental discovery. You could have asked all sorts of things, but you didn't raise anything. Well, actually, Your Honor, what we had asked for in the original complaint was an accounting. And paragraph four of the original judgment says the ALS shall account. And when they accounted, we learned that there were 412 additional infringing fixtures. That's 13% of their total product that infringed, and it's only 6% of the time. And so, you know, I recognize what Judge Clevenger said about an abuse of discretion is either an erroneous conclusion of law. And we say that the erroneous conclusion of law here is that 412 fixtures that were sold prior to entry of the judgment do not bear a royalty. And that is contrary to section 284 of Title 35. It says that they shall be no less than a reasonable royalty. Secondly, it's an error of fact because there is no earthly way that that jury could have applied, to use the judge's words in his instructions, could have applied the royalty that they had figured out— To object at the time? We didn't think we needed to because of the comment about fairness. And that's exactly what should— You mean about fairness? Yes. What do you mean? And in fairness, you will recall that Mr. Tate said he stopped his analysis back in September of last year, and that is precisely the reason that paragraph four is in the original judgment. Wait a minute. I'm confused now. It's been a state of—more than occasional state here for me, I'm afraid. But when the judge gave that instruction, what protection did you think you were getting against the possibility that there had been additional sales? Two protections, Your Honor. The first protection is that the instruction expressly says to apply the royalty to the products that you think infringed up to the time of trial. Okay. 412 of those were not disclosed. Well, but at the time, you said, fine, that's good. Well— And you had evident—I mean, you didn't object. We didn't—we didn't object because of the very next sentence. And in fairness, you will recall that Mr. Tate said he stopped his analysis back in September of last year. Okay. What did you think that sentence was giving you that you didn't have without that sentence? Paragraph four of the original judgment. In other words, you thought that what you were getting with that sentence was a promise from the judge that if additional sales turned up, that the judge would put those sales into the judgment? No, not exactly, Your Honor. What I thought we were getting by that was a recognition of the request for an accounting that had always been in the pleadings. And that's exactly what paragraph four of the judgment directed ALS to do. And only when that accounting was tendered more than a month after trial did we learn for the first time that 412 infringing fixtures were sold. And because of the striking of paragraph four, those fixtures, even though they infringe, do not bear royalty. And we suggest that is the erroneous part of the law with regard to those instructions. Did you think that with respect to the fairness sentence, that the jury was – was that something that – did that give the jury – did that justify the jury saying, well, maybe there were some additional sales, let's add in some damages? No. Right? Well, it could have. I mean, I think that was what Judge Young – Well, if it could have, then – and if that's what the jury may have done, then maybe the judge is right in saying that you got all you were entitled to. But the point about the arithmetic, 13 versus 6, is that even under the 13% of sales versus 6% of the infringing time, if they had done just kind of a linear estimate, that might suggest there would still be a substantial number of infringing fixtures that do not bear a royalty at all. And that is what we think the court should do with respect to this, is to reinstate paragraph 4. Let me ask you this question. And this must come up a lot, and I honestly don't know exactly how this is handled, although I've seen some instances. Suppose that – I think the trial ended on February 1st, or January 31st, something like that. Yes, sir. Okay. And the judgment, the actual injunction, was not entered until a week later or so. Well, as I recall, trial ended on a Thursday, and that's when we got the verdict. And the very next court day was February 1st. And in that period of time, we reviewed the record and prepared a tender judgment that was discussed at the hearing on February 1st. And that judgment included paragraph 4. The judgment that was entered, the injunction was entered on February 7th. Am I correct? There was also an injunction that – a hearing on the injunction in view of certain case law that had come out. And the injunction was entered after – may I just double-check, Your Honor? That will be fine. Well, let me just say where I'm going with this, because I'm having a hard time getting to the question. It frequently occurs that there's a gap in time between the end of the trial and the entry of the judgment, which includes, in many cases such as this, an injunction, and there may be sales that occur in between. Now, isn't it normally the course that you initiate what amounts to an ancillary proceeding to get recovery for the intervening sales? That is possible, and that is – that was not done in this case because we determined that paragraph 4 was the appropriate remedy for our client. Paragraph 4 says that within 30 days hereof – of the entry hereof, ALS shall provide a certified accounting to Genlyde of all sales of the MT2A, MT2B, MT1D multi-med hospital patient room lights from September 30th, 2006 to the date hereof. And the date hereof, Judge Young signed it on February 5th of 2007. All right. Okay, I think we have your case. I think we'd better move on. Very well, Your Honor. Thank you for your consideration. Now, we've used up all of your time, Mr. Dorney, but we'll give you a couple of minutes. Just two quick statements, Your Honor. With regard to this issue of the testing version being different than the actual application, on A347, Mr. Lemons testified on direct examination about the difference between the reading and the ambient fixtures. It says it doesn't matter which one you call which. It says because the patterns of light from both are very similar, say the first light fixture – so I could say that this is the first light fixture, and it provides light down to the reading area, and the other is the second light fixture, and it provides light onto the wall that is reflected over a broad area. So he considered them – this testimony, they considered them the same. The other statement with regard to the cross-appeal, Judge Bryson, your question, there were no sales in addition to those that – or between the time period of the jury's verdict. No, no, I understand. I was just trying to get at the problem of what you do. I mean, obviously, if things are continuing to go along in a commercial setting, there's going to come a time in which you can't put in evidence as to what's happening out on the street today. And the question is, what do you do with that situation? In this case, what happened, whether it should have happened or not, is as of September 30th, that was the cutoff point. And the question is what to do with the sales between that time and February 1st. And they tried to put it into the judgment, and my question was really going to, well, would they have been entitled to say, well, okay, we tried this case up until September 30th. Those were the only sales we had at that time, but that doesn't mean we're foreclosed forever from getting recovery for the sales that occurred after that. Except for the judge instructed the jury to consider sales up through the time of their decision. And make a guess. What's that? And make a guess. And they can make an estimate of what it was. They had monthly sales figures throughout the entire time period. They can make an estimate of what that was. The ALS did supplement at each request, except for the one that was done in the middle of trial. There was a request in September, which they then updated through September 30th. There was a later request for all of the customer files, which was given to them through the end of November. But that was not a production of a number of sales, right? That was just access to documents. Because that's what they requested was access to the documents. It was given to them. There was a final request about the fourth day of trial, which was not responded to because we were in the middle of trial and there was nobody to go make an accounting because the witnesses were at court. Thank you, Your Honor. Actually, since this is a cross-appeal, Mr. Higgins, you have the right of the last word. If you have anything further you want to add, limit it to the cross-appeal. Your Honor, I think the court fully understands our position. We do not tender any additional arguments. Very well. Thank you. The case is submitted.